Ultra-Life Laboratories, Inc. v. Commissioner.
Ultra-Life Laboratories, Inc. v. Commissioner
Docket No. 1440-62.
United States Tax Court
T.C. Memo 1964-144; 1964 Tax Ct. Memo LEXIS 193; 23 T.C.M. (CCH) 870; T.C.M. (RIA) 64144; May 22, 1964
*193 Held, that petitioner is not entitled to charge off to its bad debt reserve for 1958 an account of $28,090.58 which it allegedly held against a former debtor and is not entitled to increase its bad debt reserve for 1958 by an addition of such an amount so as to permit a chargeoff of that amount. Don O. Russell, 408 Olive St., St. Louis, Mo., for the petitioner. Robert F. Cunningham, for the respondent. BLACK Memorandum Findings of Fact and Opinion The Commissioner has determined a deficiency in petitioner's income tax for the year 1958 in the amount of $16,455.82. The deficiency is due to two adjustments made by the Commissioner to the taxable income as disclosed by petitioner's return, as follows: (a) Taxes
$ 2,485.59
(b) Bad debts
30,400.38 Inasmuch as petitioner concedes the correctness of adjustment (a) no further reference to it will be made. Adjustment (b) is explained in the deficiency notice as follows: (b) The deduction of $46,468.96 claimed as an addition to the reserve for bad debts is disallowed in the amount of $30,400.38 because you have not established that you are entitled to deduct a greater amount. By appropriate *194 assignments of error petitioner contests adjustment (b). Findings of Fact A stipulation of facts, together with exhibits attached thereto, was filed at the hearing and is incorporated herein by this reference. There was also oral testimony and certain exhibits were received in evidence at the hearing. Petitioner is a corporation organized and existing under the laws of the State of Illinois with its principal office located in East St. Louis, Illinois. Petitioner kept its books under the accrual method of accounting and filed its Federal income tax return for the taxable year ended December 31, 1958, with the district director of internal revenue at Springfield, Illinois. Black Belt Elevator & Feed Company, Inc., was a corporation organized under the laws of the State of Alabama, with its offices at Selma, Alabama. The name of Black Belt Elevator & Feed Company, Inc., was changed by charter amendment to Southern Ultra-Life, Inc., on May 26, 1958. It will sometimes hereinafter be referred to as Black Belt. Southern Ultra-Life, Inc., filed its Federal income tax returns for the taxable years ended September 30, 1958, and September 30, 1959, with the district director of internal *195 revenue at Springfield. It kept its books and filed said returns on the accrual method of accounting. On April 1, 1958, and at all times herein involved, Black Belt had issued and outstanding 2,744 1/2 shares of nonvoting noncumulative preferred stock of the par value of $10 per share, and 300 shares of common stock of the par value of $100 per share. Petitioner acquired control over Black Belt on November 6, 1956. Petitioner's control over Black Belt consisted in the acquisition of 300 shares of common stock of the par value of $100 per share. From the date of acquisition through and including the calendar year 1958, petitioner held all of the issued and outstanding common stock of Black Belt, namely, the 300 shares of common stock acquired on November 6, 1956. Petitioner did not acquire or own any of the preferred shares of Black Belt. Black Belt is a subsidiary of petitioner. Petitioner acquired control of Black Belt in 1956 for the purpose of providing an outlet for its feed products in the Southern States where large growers of broiler chickens were located. During the year in issue and at all times material herein, petitioner was engaged in the manufacturing business *196 of mixing and blending feed ingredients and the preparation of feed concentrates for use in the livestock and poultry industry. During the year in issue and at all times material herein Black Belt was engaged in the feed mill and feed storage business. Prior to the calendar year 1958, petitioner reported its method of treating bad debts for Federal income tax purposes under the specific bad debt or direct charge-off method. On May 22, 1958, the Commissioner granted petitioner permission to employ the reserve method of accounting for bad debts for Federal income tax purposes beginning with its taxable year ended December 31, 1958. The minutes of petitioner's board of directors' meeting held on March 25, 1958, contain the following: It was decided effective March 31, 1958 to discontinue the consignment of our products and ingredients at the Black Belt Elevator & Feed Company, Inc., Selma, Alabama; further, it was decided in this discontinuance that we hereby guarantee collection on all accounts receivable accrued during this consignment basis or we will assume the obligation. During the taxable year 1958 E. L. McKee was president of petitioner and Black Belt (Southern Ultra-Life, *197 Inc.). Robert Steinhauser was elected treasurer and also served as assistant secretary of petitioner and Black Belt in said year. The books and records of both corporations were kept during this period under the direction and supervision of Steinhauser in East St. Louis, Illinois. During the period commencing after the acquisition of control of Black Belt in 1956 and through June 1957, petitioner was selling its feed products to Black Belt on an "open remit" basis. Credit sales to petitioner's other customers were handled on the same basis during this period. In 1957, after the acquisition of Black Belt, petitioner discovered that the United States Government had a claim pending against Black Belt for weight shortages and for shipping inferior grains. Thereafter, and as a result of this pending claim, petitioner shipped all of its feed products to Black Belt on consignment. The Government's claim against Black Belt was settled by petitioner on February 27, 1958. Petitioner continued to ship all of its feed products to Black Belt on consignment through March 31, 1958. Thereafter, petitioner sold all of its feed products to Black Belt under its usual and regular method of conducting *198 sales of merchandise. During this period of consignment Black Belt sold consigned merchandise on credit. Black Belt would then transmit the account or invoice receivable to petitioner as security for the payment of the feed products consigned to Black Belt. The accounts receivable totaling $129,543.47 represent all of the credit sales thus made by Black Belt then on the books of petitioner during the period of consignment. These accounts were transferred to Black Belt on April 1, 1958, the date when petitioner commenced selling its feed products outright to Black Belt on open account. Included among the accounts transferred to Black Belt on April 1, 1958, was the account of Forrester Feed & Poultry Company, hereinafter sometimes referred to as Forrester, in the amount of $28,090.58. During the year 1958 and at all times material to this case Pierce Forrester of Canton, Georgia, was president of Forrester, also located in Canton. On October 24, 1958, Black Belt, in order to protect the value of sales made to the company, entered into a contract with Forrester whereby merchandise shipped to Forrester would be on a consignment basis. On December 9, 1958, petitioner's accountants *199 examined the books of Forrester at petitioner's request. They accumulated the available information and reported that on September 30, 1957, Forrester had a net worth deficit of $13,145.60, and estimated that by the time the birds or broilers would be fed out and disposed of, Forrester would have a net worth deficit in excess of $100,000. Following the report of the auditors Black Belt took over the operations of Forrester on December 18, 1958, for the purpose of feeding out the chickens and liquidating Forrester's assets of chickens. Forrester's financial position at that time was bad and it could not pay its creditors. Prior to April 1, 1958, the ledger account of Forrester (accounts receivable), identified in this record as Exhibit E, was kept and maintained by petitioner in a ledger book containing all the accounts receivable transferred by petitioner to Black Belt on April 1, 1958. On April 1, 1958, the ledger book containing all of the accounts receivable transferred to Black Belt was physically transferred to Black Belt as a part of its books and records. Thereafter, these accounts receivable recorded in the ledger transferred to Black Belt were made a part of the books *200 and records of Black Belt. This ledger transferred to Black Belt contained running debit items of all merchandise sold to Forrester. All credit entries appearing in this ledger account disclose a running total of all credits ever applied to this account, including all credit memorandums issued for merchandise returned. This account was treated by both petitioner and Black Belt as an open running account on the ledger during the period extending from June 1957 through February 25, 1959. The debit balance appearing in the Forrester ledger account on March 31, 1958, was $28,090.58, and on December 31, 1958, was $109,935.13. On February 25, 1959, Black Belt charged back to petitioner a portion of the Forrester accounts receivable in the amount of $28,090.58. Under date of February 25, 1959, Black Belt charged off as a bad debt the remainder of the Forrester accounts receivable in the amount of $71,909.42 by means of a debit to bad debt reserve and a credit to the receivables account. The guarantee given by petitioner to Black Belt on March 25, 1958, insofar as the Forrester account was concerned, was limited to the balance of $28,090.58 accumulated during the consignment period *201 and remaining unpaid and due from Forrester on March 31, 1958. Between the dates of April 4, 1958, and September 30, 1958, Forrester paid over to Black Belt total net payments of $39,480.26 in partial liquidation of its account with Black Belt. From October 6, 1958, through November 3, 1958, Forrester paid Black Belt an additional $12,689.45 on its account. Petitioner reported on its Federal income tax return for the taxable year 1958 an addition of $46,468.96 to its reserve for bad debts. Petitioner's bad debt provision of $46,468.96 includes the Forrester account which petitioner charged off against its reserve in the amount of $28,090.58. Opinion BLACK, Judge: In this case there is but one issue involved and that is whether petitioner is entitled to add to its bad debt reserve for 1958 an account which it alleges was owing to it by the Forrester Feed & Poultry Company of Canton, Georgia, which debt it alleges amounted to $28,090.58 and became worthless in the year 1958. It will be noted that the Commissioner in his deficiency notice disallowed $30,400.38 of the $46,468.96 claimed by petitioner in its income tax return for 1958 as an addition to its bad debt reserve for *202 that year. Although petitioner in its assignment of error alleged that the Commissioner had erred in his disallowance of the $30,400.38 as an addition to petitioner's bad debt reserve for 1958, we have no evidence respecting any other item than the amount of $28,090.58 against Forrester. Therefore, we do not regard that we have any issue before us regarding petitioner's addition to its reserve for bad debts at the end of 1958, except the $28,090.58 to which we have just made reference. It seems clear that petitioner is entitled to use the reserve method as to bad debts for 1958. In that year it secured permission from the Internal Revenue Service to change over from the direct method of charging off bad debts to the reserve method. The letter granting permission to make such change is in evidence and the Commissioner is not contending that at the end of 1958 petitioner is not entitled to set up on its books a reserve for bad debts. Furthermore, it is our opinion that if petitioner had a valid account against Forrester at the end of 1958 amounting to $28,090.58 it would be entitled to charge that debt against its reserve for bad debts. We think the evidence establishes that at the *203 end of 1958 Forrester was insolvent and unable to pay its debts. However, we do not think that petitioner had any valid accounts receivable against Forrester at the end of 1958. On April 1, 1958, petitioner transferred to Black Belt accounts receivable which aggregated $129,543.47. Among the accounts transferred to Black Belt was one against Forrester which amounted to $28,090.58. The ledger which contained these accounts receivable totaled $129,543.47. No change whatever was made in the accounts by Black Belt following their transfer. The account against Forrester is Exhibit E attached to the stipulation of facts. It is an open running account. The first entry in it is in June 1957 and it contains debits and credits from that date until in February 1959. This open running account shows that Forrester paid to Black Belt in 1958, subsequent to April 1 of that year, far more than enough to pay the $28,090.58 which was due on the account when it was transferred by petitioner to Black Belt on April 1, 1958. Therefore, it seems to us that at, the end of 1958 there was no account of $28,090.58 which could be properly charged back to petitioner by Black Belt on petitioner's guarantee. *204 Petitioner cites in support of its position the case of , and quotes from that case as follows: where a debtor owes to the creditor more debts than one and neither the creditor nor the debtor expresses any election as to which separate debt the payment is to be applied, "then, as between such debts, the presumption of the law is that the credit is applied most beneficially to the creditor; that is, to the most precarious debt, or the one least secured." * * * However, the Supreme Court of Alabama in that case held that the above-quoted rule for which petitioner contends here has no application to an open running account. What the court held in that case was this: Where debtor gave creditor a deed-mortgage and parties contracted that deed was to secure debts due or to become due for advances of money and supplies by virtue of any notes or agreements now in effect, and creditor kept a general running account for a number of years thereafter against debtor without any special application of payments by debtor, law would apply payments to oldest items of account, and deed was no longer effective after payments *205 of amount due under notes and agreements. The balance which was due on the Forrester account when petitioner transferred it to Black Belt was $28,090.58. It was an open running account on the ledger and was transferred to Black Belt in that form. It remained an open running account on the ledger - no change was made in it. Debits were thereafter applied to it and credits were applied. Our Findings of Fact show that payments made on the account in 1958 were more than sufficient to wipe out the $28,090.58 which was the balance due on it at the time it was transferred to Black Belt. Therefore, it seems to us that there was no $28,090.58 that was due on the account at the time it was charged back to petitioner by Black Belt. There being no account of that amount in existence petitioner could not properly charge it to its bad debt reserve for 1958. We sustain respondent on this issue and hold that petitioner could not charge to its bad debt reserve at the end of 1958 an account as worthless which obviously had been paid by Forrester prior to the time the chargeoff was made. There was no such account to charge off. Decision will be entered under Rule 50.